# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVORY L. DOWNS, | 1:10-cv-01637 AWI-MJS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| GONZALEZ, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.    BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on March 5, 2008, for attempted voluntary manslaughter, attempted murder, and three counts of assault with a firearm. (Clerk's Tr. at 371-74.) Petitioner was sentenced to a term of 25 years to life. (Pet. at 1.)

On May 1, 2009, the California Court of Appeal, Fifth Appellate District (hereinafter "Fifth DCA"), affirmed the judgment of the trial court. (Lodged Doc. 4.) Petitioner filed a petition for

1  review in the California Supreme Court.  The petition was summarily denied on July 8, 2009.

2  (Lodged Doc. 6.)

3       On September 10, 2010, Petitioner filed the instant federal habeas corpus petition.

4  Petitioner raised two claims for relief: (1) that the trial court's jury instructions regarding specific

5  intent were prejudicial, and (2) the finding of enhancements based on great bodily injury under

6  circumstances involving domestic violence should be reversed.  On March 9, 2011,

7  Respondent filed an answer to the petition.  On June 14, 2011 Petitioner filed a traverse to the

8  answer.

9  **II.    STATEMENT OF THE FACTS[1]**

10         There is little dispute about the events leading up to the charges in this
    case. [Petitioner] was living with LaTonya Wafer. He suspected that Wafer was
11    having an affair with his brother, Justin Downs.[2] Wafer denied having an affair
    with Justin on numerous occasions. Finally, out of exasperation, Wafer told him,
12    in graphic detail, that she had had sexual relations with Justin. He called Justin,
    who denied having an affair with Wafer. He and Wafer proceeded to Justin's
13    apartment to discuss the matter. Prior to going to the apartment, he retrieved a
    semiautomatic handgun.

14
         Justin and his wife, Sophia Chandler, were present when [Petitioner] and
15    Wafer arrived. Wafer and Justin repeatedly denied having any type of sexual
    relationship. [Petitioner], apparently very upset, did not believe them. He
16    eventually pulled out a gun and started shooting. Justin, Wafer, and Chandler
    were shot, none fatally.

17
         The information charged [Petitioner] with two counts of attempted murder
18    (§§ 187, subd. (a), 664), with Justin and Wafer the victims, and three counts of
    assault with a semiautomatic firearm (§ 245, subd. (b)), with Justin, Wafer, and
19    Chandler the victims. The attempted murder counts also included enhancements
    for personal discharge of a firearm, causing great bodily injury (§ 12022.53,
20    subd. (d)), and personal infliction of great bodily injury under circumstances
    involving domestic violence (§ 12022.7, subd. (e)). The assault counts included
21    enhancements for personal use of a firearm (§ 12055.5, subd. (a)(1)) and
    personal infliction of great bodily injury under circumstances involving domestic
22    violence (§ 12022.7, subdivision (e)).

23         [Petitioner] testified in his defense, admitting he "pull[ed] the trigger" on
    the date in question. He, however, attempted to explain the events leading to the
24    shooting. Wafer first told [Petitioner] that she had slept with Justin approximately
    two weeks before the shooting. Justin denied having sex with Wafer.

25

26

27  [1]The Fifth District Court of Appeal's summary of the facts in its May 1, 2009 opinion is presumed correct.
    28 U.S.C. §§ 2254(e)(1).

28  [2] We will refer to Justin Downs by his first name, not out of disrespect but to ease the reader's task.

On the night of the shooting, [Petitioner] checked the phone numbers Wafer had dialed from her cell phone. He checked Wafer's cell phone records because he suspected Wafer was involved with a man named Ernest. While checking the records, he noticed there was a phone call to Justin. [Petitioner] confronted Wafer about the phone call when he got home. Wafer became upset and told him that she had sexual relations with Justin.

[Petitioner] spoke with Justin, who denied having a relationship with Wafer. [Petitioner] was devastated. Justin and Chandler said they were coming over, so [Petitioner] left the apartment to get the gun to protect himself from Justin and to be able to scare Justin.

When Justin and Chandler did not come to [Petitioner's] apartment, [Petitioner] called Justin and asked if he and Wafer could come to Justin's apartment. [Petitioner] did not intend to use the gun. He went to Justin's apartment to talk things out. He did not know that Justin was armed with a knife.

When [Petitioner] arrived at Justin's apartment, Justin was sitting on the arm of the couch. Justin again denied having sexual relations with Wafer. When confronted, Wafer said she was lying and that she did not have sexual relations with Justin. [Petitioner] was yelling at Wafer to tell the truth. He punched the wall. Justin stood up when [Petitioner] punched the wall. [Petitioner] opened fire.

[Petitioner] did not intend to kill Justin or Wafer, but he could not explain how he felt. He did not believe he had shot at Wafer. He did not know whether a bullet had struck anyone.

[Petitioner] saw Justin run out to the patio and jump off the balcony. [Petitioner] ran out the front door. He saw Justin at the bottom of the stairs. Justin said that he loved [Petitioner] and that is when [Petitioner] stopped shooting. [Petitioner] walked to the car and started to drive away. Before leaving the apartment complex, he threw away the gun.

At first, [Petitioner] was in a state of disbelief. He also became very depressed that night. He got the gun to scare Justin in case Justin wanted to fight. [Petitioner] also testified about several incidents of violence involving Justin, apparently to bolster his testimony that he brought the gun to Justin's apartment for protection.

In closing argument, [Petitioner's] attorney argued that [Petitioner] acted in the "heat of passion," he did not intend to kill anyone, and the charges of attempted murder should be rejected. While he suggested to the jury that [Petitioner] was guilty of nothing more than negligent discharge of a firearm, it is clear the theory was that [Petitioner] should be convicted of attempted voluntary manslaughter.

(Lodged Doc. 4 at 2-4.)

## III.   DISCUSSION

### A.   Jurisdiction and Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1.   Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). A state court decision will involve an "unreasonable

application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

### 2.   Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion,"does not require that there be an opinion from the state court explaining the state court's reasoning." Harrington, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Harrington instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask

1   whether it is possible fairminded jurists could disagree that those arguments or theories are

2   inconsistent with the holding in a prior decision of this Court." Id. at 786.  Thus, "even a strong

3   case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

4   (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in

5   cases where there is no possibility fairminded jurists could disagree that the state court's

6   decision conflicts with this Court's precedents." Id.  To put it yet another way:

7       As a condition for obtaining habeas corpus relief from a federal court, a
        state prisoner must show that the state court's ruling on the claim being
8       presented in federal court was so lacking in justification that there was an error
        well understood and comprehended in existing law beyond any possibility for
9       fairminded disagreement.

10  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the

11  principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It

12  follows from this consideration that § 2254(d) "complements the exhaustion requirement and

13  the doctrine of procedural bar to ensure that state proceedings are the central process, not just

14  a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433

15  U.S. 72, 90 (1977).

16              3.   Prejudicial Impact of Constitutional Error

17      The prejudicial impact of any constitutional error is assessed by asking whether the

18  error had "a substantial and injurious effect or influence in determining the jury's verdict."

19  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22

20  (2007) (holding that the Brecht standard applies whether or not the state court recognized the

21  error and reviewed it for harmlessness).  Some constitutional errors, however, do not require

22  that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310

23  (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas

24  petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v.

25  Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do

26  not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d

27  911, 918, n. 7 (2002);  Musalin v. Lamarque, 555 F.3d at 834.

28

1    **IV.    REVIEW OF CLAIMS**

2         **A.    Improper Jury Instructions**

3         Petitioner first claims that the trial court committed "prejudicial error of constitutional

4    magnitude when it misinstructed the jury regarding the specific intent required for attempted

5    murder." (Pet. at 18.)

6         Petitioner presented this claim on direct appeal which was denied in a reasoned

7    decision by the Fifth District Court of Appeal and summarily denied by the California Supreme

8    Court. Because the California Supreme Court's opinion is summary in nature, this Court "looks

9    through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

10   the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

11   804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher

12   court agrees with lower court's reasoning where former affirms latter without discussion); see

13   also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look

14   to last reasoned state court opinion in determining whether state court's rejection of petitioner's

15   claims was contrary to or an unreasonable application of federal law under 28 U.S.C. §

16   2254(d)(1)).

17        In denying Petitioner's claim, the appellate court explained:

18        1.    Jury Instructions

19             [Petitioner] was charged in counts 1 and 2 with attempted murder. The
     trial court instructed the jury that "[t]o prove the defendant guilty of attempted
20   murder, the People must prove that, one, the defendant took at least one direct,
     but ineffective step toward killing another person; and two, the defendant
21   intended to kill that person." (See Judicial Council of Cal.Crim. Jury Instns.
     (2007-2008) CALCRIM No. 600.)
22
               [Petitioner] argues the instruction was incomplete because it "did not tell
23   the jury that, in order to find [Petitioner] guilty of [attempted murder], he had to
     have acted with the specific intent to kill, i.e., that he acted with express malice."
24
               We fail to see the logic in [Petitioner's] argument. It is clear that a jury
25   instructed that it must find that [Petitioner] intended to kill Justin also understood
     that it must find that [Petitioner] acted with express malice, which means
26   [Petitioner] must have acted with the specific intent to kill.[3] Acting with the intent
     to kill is synonymous with acting with the specific intent to kill. Once the jury was
27

28   _____

          [3] We focus only on count 2, the attempted murder of Justin, because the jury found
     [Petitioner] was not guilty of the attempted murder of Wafer.

1   instructed that to find [Petitioner] guilty of attempted murder it must find he
    intended to kill Justin, it would be redundant and confusing to instruct the jury
2   that it also must find that he acted with express malice, and express malice
    exists if [Petitioner] intended to kill Justin. The jury's guilty verdict on count 2
3   establishes that it necessarily found that [Petitioner] intended to kill Justin. This
    finding also confirms that it concluded that [Petitioner] acted with express malice,
4   even if it never so stated.

5       The cases cited by [Petitioner] do not support his argument. [Petitioner]
    cites <u>People v. Beck</u> (2005) 126 Cal.App.4th 518, in which this court found that
6   the trial court erred in instructing the jury on the attempted murder count. The
    error occurred, however, when the trial court introduced the concept of implied
7   malice into the instructions, which allowed the jury to convict the defendant
    without finding that he intended to kill the victims. We stated that a newly
8   introduced instruction, CALJIC No. 8.66, which informed the jury that to find a
    defendant guilty of attempted murder it must find that he or she intended to kill
9   the victim, 'expresses with sufficient clarity the requirement that attempted
    murder requires the specific intent to kill' for 'lay jurors' who are 'not steeped in
10  the nuances of the term 'malice aforethought.'' (<u>Beck</u>, at p. 522.) CALJIC No.
    8.66 is virtually identical in this respect with the instructions provided to the jury
11  in this case.[4]

12      Nor does <u>People v. Patterson</u> (1989) 209 Cal.App.3d 610 assist
    [Petitioner]. The <u>Patterson</u> court found the trial court erroneously instructed the
13  jury on the elements of attempted murder. As in <u>Beck</u>, the error was in
    introducing the concept of implied malice into attempted murder, thereby
14  allowing the jury to 'find [Patterson] guilty of attempted murder if it determined
    that [Patterson] intentionally committed an act which, were the victim to die,
15  would constitute murder on an implied malice or felony-murder
    theory.'[Citations.]' (<u>Patterson</u>, at p. 614.) Instead, the trial court should have
16  required the jury to find that Patterson acted with a specific intent to commit
    murder. (<u>Id.</u> at p. 613.) Patterson is not inconsistent with the instructions in this
17  case.

18      We conclude it is not necessary to instruct the jury that an attempted
    murder conviction requires it to find the defendant acted with express malice,
19  and that express malice exists if the defendant intended to commit murder, so
    long as the jury is instructed that to return a guilty verdict, it must find the
20  defendant intended to kill the victim. Such an instruction would be redundant and
    unnecessary. The instruction in this case adequately informed the jury that to
21  convict [Petitioner], it must find beyond a reasonable doubt that [Petitioner]
    intended to kill Justin. We reject [Petitioner's] argument to the contrary.

22

23  (<u>See</u> Lodged Doc. 4 at 5-6.)

24      **1.    General Principles Regarding Trial Error In Instructing Jurors**

25      This Court's review of Petitioner's claim of state instructional error is "limited to deciding

26  whether [his] conviction violated the Constitution, laws, or treaties of the United States." <u>Estelle</u>

27

28      [4] We also reviewed <u>People v. Cavazos</u> (1985) 172 Cal.App.3d 589, 595, cited by Downs, and conclude
    it is not relevant to this case.

v. McGuire, 502 U.S. 62, 68 (1991); 28 U.S.C. § 2241. In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must first conclude that the alleged error was of constitutional magnitude. See California v. Roy, 519 U.S. 2 (1996).

In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." Roy, 519 U.S. at 5; Brecht, 507 U.S. at 637. Federal habeas relief is warranted only if the Court, after reviewing the record, has "grave doubt" as to the error's effect. Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.1998). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). The trial court's error in omitting a jury instruction is less likely to be prejudicial than the trial court's misstatement of the law. Henderson, 431 U.S. at 155; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997) (habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden).

To evaluate the effect of jury instructions, the Court must look at the context of the entire trial and overall charge to the jury. Estelle, 502 U.S. at 72; Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988). They may not be judged in artificial isolation. Estelle, 502 U.S. at 72. In addition, a reviewing court's principal constitutional inquiry is whether there is a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution. See id.

While a state is generally free to define the elements of an offense, once the state has defined the elements, due process requires that the jury be instructed on each element and instructed that they must find each element beyond a reasonable doubt. Francis v. Franklin, 471 U.S. 307, 313 (1985); In re Winship, 397 U.S. 358, 364 (1970); United States v. Perez, 116 F.3d 840, 847 (9th Cir.1997); Stanton, 146 F.3d at 728. Due process requires that the jury be instructed on each element of the offense. Keating v. Hood, 191 F.3d 1053, 1061 (9th Cir. 1991); Stanton, 146 F.3d at 728 (9th Cir. 1998).

1   It necessarily follows, therefore, that constitutional trial error occurs when a jury makes
2   a guilty determination on a charged offense without a finding as to each element of the offense.
3   According to the Supreme Court, a jury instruction that omits an element of the offense
4   constitutes such an error. Neder v. United States, 527 U.S. 1, 8 (1999). However, such an
5   error "does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle
6   for determining guilt or innocence." Id. at 9. Provided that such an error occurred, Petitioner's
7   conviction can only be set aside if the error was not harmless under Chapman v. California,
8   386 U.S. 18 (1967); Neder, 527 U.S. at 15. Under the Chapman harmless error test, it must
9   be determined "beyond a reasonable doubt" whether "the error complained of did not
10  contribute to the verdict obtained." Chapman, 386 U.S. at 24.

11              **2.    Analysis**

12  This Court concurs with the Fifth DCA opinion that the jury instructions were sufficient.
13  CALCRIM No. 600 unambiguously informed the jury that the prosecution was required to prove
14  specific intent to kill. In particular, the instructions advised that to be guilty of attempted murder,
15  Petitioner "must not only intentionally commit the prohibited act" - i.e., fire the gun - "but must
16  do so with" the intent to kill. (Lodged Doc. 4 at 5.) Nothing more was required.

17  Furthermore, Petitioner's attempt to draw a distinction between the terms "express
18  malice" and "intent to kill" is unpersuasive. California courts have held that the two are one and
19  the same. See People v. Smith, 37 Cal.4th 733, 739 (2005) ("Intent to unlawfully kill and
20  express malice are, in essence, one and the same.") (internal quotation marks and citation
21  omitted); see also People v. Saille, 54 Cal.3d 1103, 1114, 2 Cal. Rptr. 2d 364, 820 P.2d 588
22  (1992) ("[E]xpress malice and an intent unlawfully to kill are one and the same."); People v.
23  Concha, 182 Cal.App.4th 1072, 1083 (2010) ("Attempted murder requires express malice, i.e.,
24  intent to kill.").

25  Consequently, the Court finds that the jury instructions did not render Petitioner's trial
26  fundamentally unfair or violate his due process rights. Accordingly, the Court cannot find the
27  Court of Appeal's rejection of Petitioner's claim to be unreasonable. See 28 U.S.C. § 2254(d).
28  Petitioner is thus not entitled to federal habeas relief on his instructional error claim.

U.S. District Court
E. D. California

1

2      **B.      Enhancement for Injury Under Circumstances Involving Domestic Violence**

3            Petitioner argues that the trial court erroneously instructed the jury on application of

4      California Penal Code section 12022.7(e) enhancement for great bodily injury under

5      circumstances involving domestic violence. Petitioner contends the enhancement is "not

6      applicable to Justin and Sophia" as they do not "fall within the category of persons to whom

7      this enhancement applies." (Pet at 26.) Petitioner argues further that People v. Truong, 90

8      Cal.App.4th 887 (2001) - which has interpreted California Penal Code section 12022.7(e)

9      contrary to his argument- was wrongly decided based on the legislative intent behind the

10     applicable state statutes and should be overturned. (Pet. at 27-29.)

11           Petitioner's claim is based wholly on the alleged violation of state law. Generally, issues

12     of state law are not cognizable on federal habeas. Estelle, 502 U.S. at 67 ("We have stated

13     many times that 'federal habeas corpus relief does not lie for errors of state law.'"), quoting

14     Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993)

15     (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

16     constitutional violation, may not be corrected on federal habeas"). In addition, "the availability

17     of a claim under state law does not of itself establish that a claim was available under the

18     United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990), quoting, Dugger v.

19     Adams, 489 U.S. 401, 409 (1989). Federal courts are bound by state court rulings on

20     questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).

21           Petitioner has not alleged violations of federal law with regard to his second claim.

22     Petitioner readily so admits in his traverse. (See Traverse a 4.) Petitioner is not entitled to

23     habeas corpus relief and it is recommended that his petition be dismissed.

24     **V.      FINDINGS AND RECOMMENDATIONS**

25           Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be

26     DENIED with prejudice. It is further recommended that the Clerk of Court be directed to enter

27     judgment.

28           This Findings and Recommendation is submitted to the assigned District Judge,

U.S. District Court
E. D. California

pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  ___April 12, 2013___          /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE